# In the United States Court of Federal Claims

No. 14-198
Filed: August 8, 2019

|  |  |  |
|---|---|---|
| BRIAN BOWLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Termination for Default; Termination for |
| v. | ) | Convenience; Bad Faith; Breach of |
| | ) | Contract |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*David Edward Bond*, Strouse & Bond, PLLC, Burlington, VT, for plaintiff.

*David M. Kerr*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

***SMITH*, Senior Judge**

This case deals with a contract dispute between Mr. Bowles and the USPS, but one of the most significant facts involves the alleged assault on Rosi O'Connell. The plaintiff was a contractor for the USPS, but throughout his performance he was treated more like an employee because of the way the Post Office operates in rural areas. His education was limited, and he had previously held entry level jobs. The problems with his supervisor began in 2010, and Mr. Bowles alleged that his supervisor was acting to deliberately undermine him. Those issues subsided for a period after Hurricane Irene hit Vermont and destroyed the West Hartford Post Office. However, the disputes resumed, culminating in a climactic assault charge against the plaintiff. While the evidence in this case initially marginally favored the plaintiff, all of that changed dramatically when his supervisor alleged he came into the post office and hit her three times on the head with a mail scanner weighing about five pounds. After a thorough review and medical testimony, it was clear to the Court, as it was to a prior criminal jury, that Ms. O'Connell was lying about the incident. The doctor who examined her immediately following the alleged attack, found no damage to her head or body. If the attack had actually occurred, Ms. O'Connell should have sustained serious head trauma or even death. This incident was just the final straw in the storied and systemic harassment and trouble-making directed at plaintiff.

Ms. O'Connell's false accusations resulted in the plaintiff standing trial for an assault he did not commit. It also serves as the prime example of a government supervisor acting in extreme bad faith, which ultimately led to the termination of plaintiff's contract performance. As Ms. O'Connell repeatedly perjured herself on the stand and engaged in incessant improper conduct as a government employee, the Court directs a copy of this decision to the United States

Attorney for the District of Columbia for further investigation and action.  In addition to the climactic event described above, the Court now lays out the facts and circumstances surrounding the termination as a whole, as well as their legal consequences.

Plaintiff, Brian Bowles, brought the present action under the Contract Disputes Act ("CDA").  *See* 41 U.S.C. §§ 7101–7109 (2012).  On June 12, 2009, Mr. Bowles contracted with the United States Postal Service ("USPS") for mail delivery and transportation services in the West Hartford, Vermont area.  Plaintiff's Exhibit (hereinafter "Pl.'s Ex.") 2 at 3.  The contract was for Highway Contract Route ("HCR") 05061, which contemplated a term of service from July 1, 2009 through March 31, 2013.  *Id.*  On May 18, 2012, USPS sent notice to Mr. Bowles that HCR 05061 was terminated for default as of April 26, 2012, for failure to provide service according to the terms of the contract.  Defendant's Exhibit (hereinafter "Def.'s Ex.") 60.  Mr. Bowles seeks damages for breach of contract and breach of the implied covenant of good faith and fair dealing.  Amended Complaint (hereinafter "Am. Compl.") at 6–7.  Defendant disputes these claims and seeks damages for replacement services and reprocurement costs due to Mr. Bowles' alleged default.  *See* Amended Answer (hereinafter "Am. Answer") at 8.  For the reasons set forth below, the Court hereby concludes that defendant wrongfully and in bad faith terminated plaintiff for default.

## I.    Findings of Fact[1]

### A.  Contract Award

On June 15, 2009, Mr. Bowles entered into a contract with USPS for HCR 05061 ("Bowles Contract"), which contemplated a term of service from July 1, 2009 until March 31, 2013.  Pl.'s Ex. 2.  HCR 05061 was a Contract Delivery Service and Combination Route, which required that Mr. Bowles deliver mail to customers and transport mail between different post offices.  *See* Trial Transcript (hereinafter "Tr.") Tr. 763:16–19.  Joseph Arsenault was the initial Contracting Officer ("CO") for HCR 05061 until January of 2011, at which point Helen Hynes became the CO in charge of Mr. Bowles' contract.  *See* Tr. 761:21–762:1.  Rosi O'Connell was the administrative official in charge of Mr. Bowles' contract and the postmaster at the West Hartford (and later Hartford), Vermont Post Office.  Pl.'s Ex. 2 at 2; Tr. 24:10–16.  As administrative official of the Bowles Contract, and in order to ensure compliance, Ms. O'Connell gave daily instructions to Mr. Bowles, monitored his performance, inspected his vehicle, and maintained proper security requirements.  Tr. 296:8–18.  Jerry Reen, the Postmaster Operation Manager ("POOM"), was Ms. O'Connell's supervisor from late 2010 until early 2012.  *See* Tr. 540:4–18.

Initially, the Bowles Contract route involved transporting and delivering mail between the post offices of West Hartford, North Pomfret, South Pomfret, and Barnard.  Tr. 16:4–19.  According to the Bowles Contract, Mr. Bowles was "required to deviate up to 1/2 mile and retrace (total of one mile) to transact business involving [certain] classes of mail."  Pl.'s Ex. 2 at

---

[1]    This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC").  Other findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion section of this opinion.

21.  In late August of 2011, Hurricane Irene struck Vermont and destroyed the West Hartford Post Office.  Def.'s Ex. 63, Para. 22.  All West Hartford Post Office operations moved to the Hartford Post Office, and Ms. O'Connell continued her position as Postmaster at the Hartford post office.  Tr. 539:2–16.

## B.  Workplace Disputes

During his first year of employment at USPS, Mr. Bowles performed the duties of his job to the satisfaction of his superiors, including Ms. O'Connell.  *See* Tr. 26:4–20.  However, from the period of October 28, 2010 through February 8, 2011, disputes arose between Mr. Bowles and Ms. O'Connell stemming from the scope of the Bowles Contract in relation to deliveries to the Trafalgar Square Bookstore.  *See* Tr. 26:21–28:21; Pl.'s Ex. 21 (providing a record of performed Extra Trips to the Trafalgar Square Bookstore beginning on October 28, 2010).  The Trafalgar Square Bookstore, located near the North Pomfret post office, is one-tenth of a mile from Mr. Bowles' route.  Tr. 576:17–20.  Karen Lundquist, the Officer in Charge of the North Pomfret Post Office, frequently asked Mr. Bowles to make "extra trips" to pick up mail from the Trafalgar Square Bookstore, which was not on Mr. Bowles' route.  Tr. 552:10–12.  Extra Trips are "an additional trip of service operated on an infrequent time basis over the same route or part as normally provided under the terms of the contract," and their compensation must be negotiated before performance  Pl.'s Ex. 2 at 47.  However, if the CO and the contractor failed to negotiate compensation in advance, then the contractor must perform the Extra Trip at the direction of the CO and receive reimbursement after performance.  *See id.*

In order to receive additional payment from USPS for Extra Trips, Mr. Bowles' administrative official, Ms. O'Connell, needed to submit paperwork to the CO.  *See* Tr. 429:3–5.  Ms. O'Connell initially did not recognize the pick-ups from the Trafalgar Square Bookstore as Extra Trips, and therefore did not fill out the proper paperwork for additional payment.  *See* Tr. 557:24–558:20, 576:9–577:6, 710:21–711:12.  Mr. Bowles kept handwritten notes of his pick-ups from the Trafalgar Square Bookstore, eventually submitting them to Jim Wimberg, the Transportation Manager for White River Junction.  Tr. 427:2–5; Pl.'s Ex. 21.  However, USPS accounting could not accept the submissions from Mr. Wimberg because the annotations were not made on official USPS forms.  Tr. 477:8–13.  The issue regarding the Trafalgar Square pick-ups was later resolved at a meeting held on February 8, 2011.  Tr. 589:22–590:2.

In addition to payments for pick-ups from the Trafalgar Square Bookstore, a continuing concern of Mr. Bowles was the over-garnishment of his wages during his time at USPS.  Tr. 99:8–100:11.  Mr. Bowles' paychecks were subject to two garnishment orders, totaling $350 a month.  Tr. 98:14–99:10.  Throughout Mr. Bowles' time at USPS, the entire amount of his monthly wages was garnished on thirteen separate occasions, the first time beginning in July of 2009.  Tr. 100:2–101:1.  The problems with wage garnishment continued throughout the entire time Mr. Bowles worked for USPS.  *See* Tr. 100:17–101:7.

Shortly after informing Mr. Wimberg and Mr. Condon about the problems with receiving payment for the trips to the Trafalgar Square Bookstore and wage garnishment, Mr. Bowles and Ms. O'Connell engaged in another dispute.  Pl.'s Ex. 57.  Mr. Bowles alleges that Ms. O'Connell approached him at the North Pomfret post office and ordered him to do work not within his

contract. *See* Tr. 27:6–11.  Mr. Bowles alleges that she then held a pair of scissors to his face while stepping on his foot and slamming mail bins around. *See* Tr. 27:12–14; Pl.'s Ex. 22.  Ms. O'Connell denies such an incident occurred. *See* Pl.'s Ex. 57.

On January 7, 2011, Ms. O'Connell and Ms. O'Connell's Postmaster Relief, Jesse Davis, tried to conduct an inspection of Mr. Bowles' vehicle at the West Hartford post office.  Tr. 41:24–42:24.  Mr. Bowles refused to allow his car to be searched and left the post office in his vehicle.  Tr. 42:15–24.   Mr. Bowles later received a disciplinary report in the form of a Contract Route Irregularity Report, also known as a Form 5500, for abandoning his route. *See* Def.'s Ex. 9.  Three days later, on January 10, 2011, Ms. O'Connell and Andrew Hutt, the Postmaster in Sharon, Vermont, inspected Mr. Bowles' vehicle.  Pl.'s Ex. 31.  Mr. Bowles allowed the inspection to proceed, but Ms. O'Connell filed a Form 5500 against him on January 10, 2011, for alleged unprofessional activity during the inspection. *See* Pl.'s Ex. 102.

Additional disputes unrelated to vehicle inspections also occurred throughout the month of January 2011.  On January 19, 2011, Ms. O'Connell called the police and alleged that Mr. Bowles verbally assaulted her at the West Hartford post office.  Pl.'s Ex. 39.  Mr. Bowles denied ever verbally assaulting her and stated that Ms. O'Connell was the aggressor.  Pl.'s Ex. 39.  Six days later, on January 25, 2011, Mr. Bowles filed an incident report with Mr. Wimberg, stating that a letter he received from the United States Equal Employment Opportunity Commission was delayed due to an incorrect zip code.  Def.'s Ex. 17 at 268.  Mr. Bowles believed that Ms. O'Connell was responsible for the delay in his receipt of that letter.  Tr. 250:2–25.

### C.  Meeting on February 8, 2011

On February 8, 2011, a meeting was called to address both Ms. O'Connell's and Mr. Bowles' concerns over their work environment.  Pl.'s Ex. 57.  Both parties were given opportunities to voice their concerns about treatment they received from the other. *Id.*  As a result of this meeting, postal officials learned that Mr. Bowles was not receiving payments for his Extra Trips to the Trafalgar Square Bookstore. *Id.*  Postal officials informed Ms. Lundquist and Ms. O'Connell that they were responsible for the extra trip paperwork, and Bonny LaPorte volunteered to teach both Ms. Lundquist and Ms. O'Connell how to do the proper paperwork for payments outside of Mr. Bowles' contract. *Id.*  After Mr. Bowles raised his complaints, Ms. O'Connell voiced her concerns about Mr. Bowles' alleged bad attitude and her fear of him. *Id.*  The meeting concluded with postal officials directing Mr. Bowles, Ms. O'Connell, and Ms. Lundquist to work together, otherwise someone would be let go from their position.  Pl.'s Ex. 57.

Following the meeting between the parties, both Mr. Bowles and Ms. O'Connell worked cooperatively.  Def.'s Ex. 63 at para. 21.  On April 6, 2011, Mr. Bowles was paid for his past Extra Trips to the Trafalgar Square Bookstore.  Def.'s Ex. 69.  In August of 2011, Hurricane Irene struck Vermont, destroying the West Hartford post office.  Def.'s Ex. 63 at para. 22.

Mr. Bowles continually received payment for his Extra Trips to the Trafalgar Square Bookstore until March of 2012, at which point he was not paid for three of his February Extra Trips.  Tr. 78:5–13; Pl.'s Ex. 69.  As a result of that nonpayment, Mr. Bowles refused to make pick-ups from the Trafalgar Square Bookstore in March of 2012. *See* Tr. 88:5–18.  On March

15, 2012, Mr. Vitagliano, the new temporary POOM, told Ms. O'Connell to direct Mr. Bowles to continue these pick-ups. Pl.'s Ex. 63. Ms. Dube, the new Transportation Manager, also contacted Mr. Bowles regarding his refusal to make pick-ups from the Trafalgar Square Bookstore. Tr. 378:14–381:2. Ms. Dube realized that Mr. Bowles was not getting paid for a hardship service on his route, and she applied for a hardship service adjustment to USPS accounting to reimburse Mr. Bowles for the same. Pl.'s Ex. 66. Mr. Bowles began receiving payment for the hardship service on March 26, 2012. Def.'s Ex. 27. Ms. Dube continued to work on resolving the Trafalgar Square Bookstore issue, and, on April 8, 2012, USPS formally amended Mr. Bowles' contract to pay him $40 for each "as needed" Extra Trip. Tr. 808:13–24. On March 28, 2012, USPS paid Mr. Bowles for the three Extra Trips he performed in February of 2012. Def.'s Ex. 69; Tr. 258:25–259:3.

After speaking on the phone with Mr. Bowles, Ms. Hynes, the new CO, also reached out to Ms. O'Connell to discuss Ms. O'Connell's concerns with Mr. Bowles. Def.'s Ex. 36. Among Ms. O'Connell's chief concerns was Mr. Bowles' improper use of the scanner. *See* Def.'s Ex. 36. USPS implemented the use of scanners after Hurricane Irene. *See* Tr. 89:5–10. Ms. O'Connell was required to issue Mr. Bowles an individual employee bar code to access the scanner. Tr. 96:10–11. Instead of issuing Mr. Bowles an employee bar code, Ms. O'Connell would input her own employee code to activate the scanner for Mr. Bowles to use throughout the day. Pl.'s Ex. 73. Mr. Bowles alleged at trial that before beginning work in the mornings, the scanner would not be activated or it would be out of battery. Tr. 94:7–11. Mr. Bowles also claimed that while scanners needed to be returned to their cradle after use every day, he often returned to the West Hartford post office after it closed, and he did not have access to the scanner cradle area. *See* Tr. 92:15–93:9. This required him either to take the scanner home with him or leave it in an open area in the post office. *See* Tr. 93:10–14. Ms. O'Connell repeatedly issued Mr. Bowles Form 5500s over his alleged refusal to use the scanner and place the scanner in the cradle. Pl.'s Ex. 102. Mr. Bowles failed to file responses to the Form 5500s. Tr. 224:25–225:14.

### D.  Meeting on April 20, 2012

As a result of the Form 5500s, postal officials scheduled a formal meeting on Friday, April 20, 2012, between Mr. Bowles, Ms. O'Connell, Mr. Vitagliano, and Ms. Dube. Pl.'s Ex. 78. Mr. Vitagliano began the meeting by confronting Mr. Bowles about his alleged unprofessional behavior toward Ms. O'Connell. *See* Pl.'s Ex. 76. Mr. Bowles denied such conduct and voiced concerns regarding the allegedly unfounded accusations repeatedly filed against him. *See id.* Mr. Vitagliano stated that, as those accusations were already resolved, this meeting was to address Mr. Bowles' failure to use a scanner and his profanity in the workplace. *See id.* Mr. Bowles stated that he was given neither a scanner nor an employee barcode, that he was never properly trained to use a scanner, and he denied any allegations of improper workplace conduct. *See id.* The conversation then turned to Mr. Bowles' failure to respond to the Form 5500s filed against him. *See id.* Postal supervisors explained the Form 5500 process to Mr. Bowles, as he was unaware that failing to respond to a Form 5500 within ten days is an admission of the facts stated within it. *See* Pl.'s Ex. 76. Ms. O'Connell admitted that she had not set up an employee barcode for Mr. Bowles, but instead would input her own barcode into

the scanner for him to use.  *See id.*  Immediately following the meeting, postal supervisors issued Mr. Bowles an employee barcode.  Tr. 234:25–235:3.

On April 23, 2012, Mr. Bowles reached out to Mr. Deenihan, a USPS Supply Management Specialist, to discuss his concerns about the April 20, 2012 meeting.  Tr. 112:24–115:7; Pl.'s Ex. 78.  Mr. Bowles was upset by the meeting and "believed the focus of the meeting was to berate him for his alleged past behavior and conflicts with [Ms. O'Connell], and [Ms. Lundquist]."  Pl.'s Ex. 78.  During this conversation, Mr. Bowles stated that "he was no longer going to perform service on HCR 05061."  *Id.*  Mr. Deenihan told Mr. Bowles that he would be liable for reprocurement costs, and he was creating an Anticipatory Breach of Contract.  *See id.*  Mr. Bowles eventually agreed to resume his contract until May 31, 2012.  *See id.*  Mr. Deenihan then informed the CO of this conversation and suggested that Mr. Bowles be allowed to terminate his contract on June 30, 2012 "due to the history between [Ms. O'Connell], [Ms.] Lundquist, and the Supplier."  *Id.*  While Mr. Bowles was contacting USPS officials, Ms. O'Connell continued citing complaints against Mr. Bowles.  On April 24, 2012, Ms. O'Connell sent an email to Jane Draper, her postmaster representative, complaining that Mr. Bowles' unprofessional conduct in the workplace had not improved since the meeting four days prior. *See* Pl.'s Ex. 79.

### E.  Termination of HCR 05061

The parties dispute the events that occurred on April 26, 2012, which led Mr. Bowles to cease performance of his contract.  At trial, Ms. O'Connell claimed that Mr. Bowles attacked her with a scanner after she requested to input numbers into the scanner he was using.  Tr. 666:24–668:10.  Specifically, she claimed that Mr. Bowles hit her over the head three times with the scanner.  Tr. 669:1–6.  Mr. Bowles testified that Ms. O'Connell asked for his scanner, and he denied her request before leaving the post office to begin delivering mail.  *See* Tr. 119:2–21. While at the North Pomfret post office, Mr. Bowles spoke on the phone with Mr. Vitagliano, who immediately told Mr. Bowles to return to the Hartford post office without explanation.  Tr. 121:13–122:3.  Mr. Bowles refused Mr. Vitagliano's request to return to the Hartford post office, and instead left the North Pomfret post office and returned to his home.  Tr. 122:1–5; Tr. 139:2–4.  Mr. Vitagliano sent Ms. Dube to the Hartford post office, and when she arrived she saw police cars and Ms. O'Connell being loaded onto an ambulance.  Tr. 400:6–401:21.  Ms. Dube's first initiative at the scene was to make sure that Mr. Bowles' route was covered so customers received mail that day.  Tr. 405:25–406:2.  When Mr. Bowles did not respond to Ms. Dube's attempts to reach him, Ms. Dube called Carlene Hewitt, who knew Mr. Bowles' mail route.  *See* Tr. 407:9–408:10.  Later that same day, Mr. Bowles called Mr. Deenihan to explain his version of the events that took place that morning.  *See* Pl.'s Ex. 100.  On May 18, 2012, USPS notified Mr. Bowles that his contract was terminated for default.  *See* Pl.'s Ex. 92.

### II.    Procedural Background

The United States District Court for the District of Vermont transferred this case to the Court of Federal Claims on March 11, 2014, and plaintiff filed his Amended Complaint on April 22, 2014.  *See generally* Am. Compl.  On July 23, 2014, defendant filed its Answer to plaintiff's Amended Complaint.  *See generally* Answer.  Defendant amended its Answer on June 29, 2017,

- 6 -

and filed a counterclaim against Mr. Bowles. *See* Am. Answer. Plaintiff filed his Answer to defendant's Counterclaim on January 9, 2018. *See* Answer to Counterclaim. The Court held trial in this case on September 17–20, 2018, in Burlington, Vermont. Plaintiff filed his Post-Trial Brief on November 9, 2018. Defendant filed its Response to plaintiff's Post-Trial Brief on February 8, 2019, and plaintiff filed his Reply Brief on February 21, 2019. The Court held Closing Argument in this case on March 7, 2019 at the National Courts Building in Washington, D.C.

## III.    The Trial Testimony

In September of 2018, trial was held in Burlington to determine liability and any potential damages related to Mr. Bowles' Complaint. The trial consisted of testimony from eight witnesses, as well as a reading of a deposition transcript into the record of a witness unavailable for trial.

Plaintiff presented the testimony of the following seven witnesses:

- *Brian Bowles*, plaintiff and contractor for HCR 05061;
- *Patricia Clayton*, former USPS Contract Transportation Specialist;
- *Christine Dube*, former USPS Transportation Manager;
- *James Wimberg*, former USPS Transportation Manager;
- *Carlene Hewitt*, former USPS Postmaster Relief;
- *Rosi O'Connell*, USPS Postmaster at West Hartford Post Office;
- *Deposition Transcript of Dr. Marcus Hampers*, Ms. O'Connell's examining physician at Dartmouth-Hitchcock Medical Center on April 26, 2012.

Defendant presented the testimony of the following two witnesses:

- *Helen Hynes*, former USPS CO for Mr. Bowles' HCR;
- *Richard Deenihan*, former USPS Supply Management Specialist.

The parties presented testimony to the Court describing the nature of the contract between USPS and Mr. Bowles, the events leading up to Mr. Bowles' default termination, and the relationship between Mr. Bowles and other USPS employees. The trial transcript consists of 839 pages and sixty-five admitted exhibits. With post-trial briefing completed and closing argument heard, this case is ripe for decision.

## IV.    Discussion

### A. Threshold Matters

The Tucker Act confers jurisdiction on this Court over claims arising under the Contract Disputes Act of 1978 ("CDA"). *See* 28 U.S.C. § 1491; 41 U.S.C. §§ 7101–7109. "The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act], . . . on which a decision of the contracting officer has been issued under section 6 of that

Act." 28 U.S.C. § 1491(a)(2).  Included within this jurisdiction is the Court's power to "render a declaratory judgment regarding the propriety of a default termination." *C.D. Hayes, Inc. v. United States*, 74 Fed. Cl. 699, 705 (2006).  However, the Court's jurisdiction over CDA claims is predicated on the satisfaction of certain procedural requirements outlined in the CDA.

The CDA requires that claims by contractors against the government relating to a contract shall be submitted in writing to a CO.  41 U.S.C. § 7103(a).  For claims over $100,000, the contractor must certify that the claim is made in good faith, the supporting data is accurate and complete to the best of the contractor's knowledge, and the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.  41 U.S.C. § 7103(b)(1).  The CO must then issue a written decision to the contractor.  41 U.S.C. § 7103(d).  COs are "required to issue final decisions on all claims asserted by the government *against a contractor*, including the decision to terminate a contract for default."  *Keeter Trading Co., Inc. v. United States*, 79 Fed. Cl. 243, 249 (2007) (citing *C.D. Hayes*, 74 Fed. Cl. at 704–05) (emphasis added).  After fulfilling each of these requirements, a party may bring an action directly to the Court of Federal Claims.

Throughout the course of litigation, defendant has disputed the Court's jurisdiction over certain claims asserted by plaintiff.  *See, e.g.*, Defendant's Motion to Dismiss and for Summary Judgment (hereinafter "Def.'s Mot. to Dismiss").  Specifically, defendant argues plaintiff failed to fulfill the requirements of the CDA for his money damages claims, as no final decision was rendered from a CO on those claims.  *See* Def.'s Mot. to Dismiss at 6–7.  For the money damages claims involving breach of contract and breach of implied covenant of good faith and fair dealing, the Court relies on its previous ruling denying defendant's motion to dismiss those claims.  *See* Order, ECF No. 33.

As an additional matter, defendant now argues that plaintiff failed to assert a claim of wrongful termination for default to convert the termination for default into a termination for convenience.  *See* Defendant's Response to Plaintiff's Post-Trial Memorandum (hereinafter "Def.'s Brief").  While plaintiff's Amended Complaint neglects to delineate a specific count for wrongful termination for default, defendant impliedly consented to the wrongful termination for default claim through arguments made in its briefs and during its presentation at trial.

Rule 15(b) of the Rules of the Court of Federal Claims ("RCFC") provides for amended and supplemental pleadings during and after trial.  *See* RCFC 15(b).  Specifically, the Rule contemplates that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  RCFC 15(b)(2).  Indeed, failure to amend the pleading does not affect the result of the trial of that issue.  *See* RCFC 15(b)(2).  While defendant disputes the applicability of a wrongful termination for default claim, defendant cites to the legal standards of this claim and fully briefed the issue in its Response to Plaintiff's Memorandum of Contentions of Fact and Law ("Defendant's Memorandum") and in its Post-trial Brief.  *See* Defendant's Response to Plaintiff's Memorandum of Contentions of Fact and Law (hereinafter "Def.'s Memo.") at 10–16 (citing *Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1249 (Fed. Cir. 2002)); Def.'s Brief at 31–34 (describing the government's justification for terminating Mr. Bowles' contract and the lack of excuse for Mr. Bowles' alleged default).  Additionally, during opening

statements, counsel for defendant expressly described the applicable standard for wrongful termination for default by stating, "the undisputed fact that Mr. Bowles stopped performing his contract shows that the default termination is valid." Tr. 7:15–17. "The burden therefore shifts to Mr. Bowles. He must show that his decision to stop delivering the mail was excusable." Tr. 7:19–21. Based on the arguments made in defendant's briefs and at trial, defendant impliedly consented to plaintiff's wrongful termination for default claim. The Court finds that plaintiff satisfied the jurisdictional prerequisites for this case.

## B. Legal Standards

The Court reviews the CO's decision to terminate Mr. Bowles' contract for default, plaintiff's claim for breach of contract through constructive discharge, and plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Reviewing a CO's decision to terminate a contract for default requires the Court to conduct a *de novo* review of that decision. *See Moreland Corp. v. United States*, 76 Fed. Cl. 268, 284 (2007). The CO's decision to terminate a contract for default is a "drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Keeter Trading Co., Inc. v. United States*, 79 Fed. Cl. 243, 252 (2007) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)).

First, the burden rests on the government "to prove by a preponderance of the evidence that a termination for default was justified." *Pinckney v. United States*, 88 Fed. Cl. 490, 505 (2009) (citing *Lisbon*, 828 F.2d at 765). This requires a "nexus between the government's decision to terminate for default and the contractor's performance." *Keeter Trading*, 79 Fed. Cl. at 252 (citing *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329 (Fed. Cir. 1999)). If the government proves that a termination for default was justified, then the burden shifts to the plaintiff to show that "default was excusable under the terms of the contract." *Airport Indus. Park, Inc. v. United States*, 59 Fed. Cl. 332, 338 (2004). Default is excusable if "improper government actions . . . were the primary or controlling cause of the default." *Keeter Trading*, 79 Fed. Cl. at 253.

If the Court determines that the CO improperly terminated the contract for default, the termination for default is converted into a termination for convenience. *Pinckney v. United States*, 88 Fed. Cl. 490, 506 (2009). In accordance with this conversion, plaintiff receives damages in the form of "costs incurred prior to termination, a reasonable profit on work performed, and certain additional costs associated with termination." *Pinckney*, 88 Fed. Cl. at 506. However, the contractor may recover traditional contract damages, instead of mere termination for convenience damages, if the contractor can show that the CO's decision to terminate the contract for default was made in bad faith. *See Keeter Trading*, 79 Fed. Cl. at 263 (citing *Torncello v. United States*, 231 Ct. Cl. 20 (1982)). "[E]ven in cases in which a contractor has technically defaulted on its contractual obligations, the court will not uphold a default termination where the agency has acted in bad faith in administering the contract." *Keeter Trading*, 79 Fed. Cl. at 252 (citing *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 712 (2000)). "[G]overnment agents are presumed to discharge their duties in good faith." *Abcon Assocs., Inc. v. United States*, 49 Fed. Cl. 678, 688 (2001). Therefore, a determination that the agency administered the contract in bad faith requires "irrefragable proof." *Torncello*, 681 F.2d

at 770 (citing *Knotts v. United States*, 128 Ct. Cl. 489, 492 (1954)).  This Court defined "irrefragable proof" to mean "an improper motive on the part of the government" shown by clear and convincing evidence, which could include a specific intent to injure the contractor or a conspiracy to get rid of the contractor.  *Pinckney*, 99 Fed. Cl. at 506.  Importantly, "[i]f the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, [the agency] for whom the various agents acted should be held to have violated that standard."  *Struck Constr. Co. v. United States*, 96 Ct. Cl. 186, 221 (1942).

### C.  Termination for Default

Defendant argues that the termination for default was reasonable, as the CO was justified in terminating the contract for default and none of the alleged prior breaches by USPS excuse Mr. Bowles' non-performance.  *See* Def.'s Brief at 31–34.  Defendant points to the fact that on April 26, 2012, after the alleged assault on Ms. O'Connell, Mr. Bowles told postal officials that he would no longer perform the contract.  *See* Def.'s Brief at 32 (citing Pl.'s Ex. 100).  Additionally, defendant states that Mr. Bowles' anticipatory repudiation became total breach on April 27, 2012, when Mr. Bowles did not perform the contract and did not provide for a back-up driver to complete his route.  Def.'s Brief at 32.

Plaintiff argues that his refusal to perform the contract did not amount to anticipatory repudiation, as "a contractor's refusal to perform in the presence of a material breach of a contract by the government does not constitute repudiation."  *See* Plaintiff's Post-Trial Brief (hereinafter "Pl.'s Brief") at 21 (citing *Keeter Trading*, 79 Fed. Cl. at 253) (internal citation omitted).  Plaintiff then cites to incidents of abuse at the hands of multiple postal officials throughout his time at USPS and the failure of USPS to ensure that he received payment on time as evidence of USPS' breach of the contract.  *See* Pl.'s Brief at 22.  Plaintiff also argues that while he was suspended on April 26, 2012, his back-up driver, Carlene Hewitt, covered his route that day.  *See* Pl.'s Brief at 22.  In addition to his breach of contract claim, plaintiff argues that USPS breached the implied covenant of good faith and fair dealing due to the conduct by Ms. O'Connell and other postal officials.  *See* Pl.'s Brief at 22–24.  Due to these breaches, plaintiff alleges the CO improperly terminated the contract for default.  *See* Pl.'s Brief at 24–25.  For the following reasons, the Court finds that the CO improperly terminated Mr. Bowles' contract for default.  The Court should note here that it found Mr. Bowles' extensive testimony highly credible.  Mr. Bowles is not a sophisticated or highly educated man.  He found it difficult to cope with some of the forms sent to him criticizing him unfairly.  He also had difficulty understanding the pattern of hostility following the April 26th incident and just retreated to his home.  He was an intimidated man, not a violent or even activist person.  He was not a Type A personality.

Throughout the duration of Mr. Bowles' contract with USPS, he experienced repeated instances of abuse from multiple postal officials that indicate bad faith on the part of the government.  At trial, the Court found Mr. Bowles' and Mr. Wimberg's testimony credible, while finding no credence in Ms. O'Connell's testimony.  Overall, Ms. O'Connell's conduct in administering Mr. Bowles' contract demonstrated that she had a specific intent to injure Mr. Bowles, and to dispossess him of HCR 05061.  This began with Ms. O'Connell's refusal to fill out the requisite paperwork to ensure that Mr. Bowles was paid for the Extra Trips to the Trafalgar Square Bookstore.  *See* Tr. 30:12–22; Pl.'s Ex. 57.  In fact, Ms. O'Connell continued to

dispute the appropriateness of payment for Mr. Bowles' trips to the Trafalgar Square Bookstore at trial. *See* Tr. 558:17–559:9; Tr. 711:23–712:2. Additionally, Mr. Bowles' entire paycheck was garnished on thirteen separate occasions during his time at USPS, forcing him to seek these erroneously withheld funds without help from any USPS officials. Tr. 98:17–100:4.

With respect to Mr. Bowles' vehicle inspections, Mr. Wimberg identified multiple issues regarding Ms. O'Connell's administration of the Bowles Contract. At trial, Mr. Wimberg stated that the inspection of Mr. Bowles' vehicle was conducted under improper conditions, and he questioned the necessity of the inspection. *See* Tr. 438:23–439:1. Mr. Wimberg's belief of impropriety largely stemmed from Mr. Hutt's involvement, as he was a postmaster from a different post office. Tr. 439:2–12. Nevertheless, despite Mr. Bowles' compliance with the inspection, Ms. O'Connell gave him a Form 5500 for the incident. Pl.'s Ex. 102 at 2. Mr. Wimberg, however, stated that he believed Mr. Bowles acted appropriately by calling him during the inspection, and that the length of time taken by Mr. Hutt and Ms. O'Connell to conduct the inspection was unnecessary. *See* Tr. 439:17–19; 448:5–9. Mr. Wimberg also agreed that there had been no problems with Mr. Bowles before this incident, and that Ms. Lundquist and Ms. O'Connell were the only postal employees to cite problems with Mr. Bowles. *See* Tr. 448:18–449:21. That Ms. O'Connell inspected Ms. Hewitt's vehicle in a manner that greatly differed from her inspection of Mr. Bowles' vehicle further evidences the disparate treatment he received. Tr. 517:7–518:11 (describing an inspection as taking ten to fifteen minutes with Ms. Hewitt staying in her car during the inspection).

On January 19, 2011, Ms. O'Connell called the police to report that Mr. Bowles verbally assaulted her. Pl.'s Ex. 39. At trial, Mr. Bowles stated that when he went into the post office to pick up the mail that day, Ms. O'Connell immediately called Ms. Lundquist and told her to call the police, as Mr. Bowles was harassing her. *See* Tr. 62:1–11. Mr. Bowles subsequently waited for the police at the post office and denied the accusation. *See* Tr. 62:12–22. Mr. Wimberg could not verify Ms. O'Connell's statements regarding the alleged verbal assault. Pl.'s Ex. 39; Tr. 464:22–25. The Court found both plaintiff's and Mr. Wimberg's testimony convincing on these issues, and concludes that Ms. O'Connell falsified this verbal assault.

In addition to falsifying incidents, Ms. O'Connell continually wrote Mr. Bowles Form 5500s in order to injure him. Ms. O'Connell wrote Mr. Bowles Form 5500s for his improper use of the scanner, despite the fact that she never issued Mr. Bowles an employee barcode to access the scanner or trained him on the proper use of the scanner. *See* Pl.'s Ex. 102; Tr. 97:3–7; Tr. 389:5–7 (stating it was Ms. O'Connell's job to provide Mr. Bowles with an employee barcode for him to use for the scanner). Furthermore, Ms. O'Connell repeatedly issued Mr. Bowles Form 5500s for not placing his scanner in the cradle each night, despite his inability to access that area due to Ms. O'Connell closing the post office before he returned from his route. *See* Pl.'s Ex. 102; Tr. 92:23–93:4.

Other postal officials also contributed to USPS's bad faith towards Mr. Bowles. The record includes details regarding two meetings that emphasized Mr. Bowles' conduct without the postal officials questioning the veracity of Ms. O'Connell's allegations. *See* Tr. 76:2–77:10 (explaining that Mr. Bowles was accused of mishandling the mail during the first meeting held on February 8, 2011); Pl.'s Ex. 76 (documenting Mr. Bowles' explanation to the postal officials

- 11 -

of their failure to give him a scanner, to assign him an employee barcode, or to provide him with training on how to use the scanner) .  However, both meetings elucidated Ms. O'Connell's improper administration of the contract, her failure in adequately processing Mr. Bowles' payments for Extra Trips, and her unsuitable USPS scanner procedures.  *See* Pl.'s Ex. 57; Pl.'s Ex. 76.

After the meeting held on April 20, 2012, where Mr. Bowles was accused of multiple offenses by postal officials, Mr. Bowles expressed concerns to Mr. Deenihan.  *See* Tr. 112:24–114:21; Pl.'s Ex. 78 (relaying to the CO that Mr. Bowles was upset about the meeting and felt that the focus of the meeting was to berate him).  Mr. Bowles told Mr. Deenihan that he wished to end the contract, but Mr. Deenihan convinced Mr. Bowles to continue performance of the contract for an additional month to avoid reprocurement costs.  *See* Tr. 117:17–118:14 ("I told Mr. Deenihan that I could not continue on in this job, that this is not part of my contract, to be subjected to this, and I wanted to enter out of the contract.").

Mr. Bowles finally determined that he could no longer continue with his contract when Ms. O'Connell falsely accused him of assault on April 26, 2012.  On the morning of April 26, 2012, Mr. Bowles entered the Hartford post office to collect his mail.  *See* Tr. 118:19–119:4.  Ms. O'Connell entered the room and demanded that he hand over his scanner and employee barcode.  *See* Tr. 119:2–21.  Mr. Bowles did not hand over his scanner or employee barcode for fear that she would use his employee barcode to fraudulently label packages under his name.  *See* Tr. 120:3–15.  Mr. Bowles immediately left the post office to continue his route.  Tr. 120:19–22.  After delivering the mail on his route, he arrived at the North Pomfret post office and discussed Ms. O'Connell's erratic behavior with Jean Jennings, the Post Master Relief at North Pomfret.  Tr. 120:23–121:5.  Mr. Bowles then tried to call Mr. Vitagliano to express his concerns over Ms. O'Connell's behavior, but Mr. Vitagliano did not answer.  Tr. 121:13–15.  When Mr. Vitagliano returned his call, he immediately ordered Mr. Bowles to return to the Hartford post office without explanation.  Tr. 121:16–21.  Mr. Bowles recognized that this was an unusual order, as he was in the middle of his postal route.  Tr. 121:22–25.  In light of Ms. O'Connell's behavior that morning and her history of filing allegations, Mr. Bowles feared that he was facing yet another accusation.  Tr. 123:9–21.  Thus, Mr. Bowles refused to drive to the Hartford post office, told Jean Jennings that he was quitting, and went home.  *See* Tr. 138:23–139:4.  When Mr. Bowles arrived at home, he contacted Mr. Deenihan to voice his concerns regarding the entire time he worked with USPS and to let him know that he was no longer performing the contract.  Tr. 139:8–140:20.  Mr. Bowles learned of Ms. O'Connell's assault allegation five days later from Jean Jennings, confirming his initial fear of a false allegation.  Tr. 142:8–20.

Dr. Marcus Hampers, the doctor who examined Ms. O'Connell on April 26, 2012, explained in his deposition that Ms. O'Connell displayed no signs of trauma to her head, which she claimed Mr. Bowles hit with a scanner three times.  Tr. 749:2–10 ("I found no evidence of a—of any trauma to her head.").  Additionally, Dr. Hampers observed that Ms. O'Connell's behavior during the examination on April 26, 2012, displayed signs of secondary gain, which he described as "benefitting from an injury or an illness, or exaggerating an illness or an injury for a secondary gain, whether it's more attention, or in some cases, it's for—in hopes of getting some additional compensation for whatever the injury or illness is."  *See* Tr. 746:4–7; Tr. 738:9–14.  The Court found Mr. Bowles' testimony and Dr. Hampers' deposition credible.  During trial, at

the request of the Court, defendant obtained a scanner matching the one used in the alleged incident and presented it to the Court. Upon physical examination, the Court found that use of a five-pound scanner with a metal bottom and heavy plastic sides in an assault against Ms. O'Connell would have inevitably resulted in a large amount of physical damage or even death to Ms. O'Connell. She claimed Mr. Bowles struck her three times on the head. This, according to Ms. O'Connell caused her to fall to the floor unconscious. Therefore, the Court concludes that Ms. O'Connell falsely accused Mr. Bowles of assault.

All of these instances of abuse show that USPS breached the implied covenant of good faith and fair dealing, preventing Mr. Bowles from continuing performance of his contract with USPS. Plaintiff has met the high standard of showing bad faith on the part of the government by clear and convincing evidence of specific intent to injure plaintiff. As such, the CO's decision to terminate the contract for default was unjustified. The Court does not consider plaintiff's breach of contract claim, as the termination for default by the CO was improper based on the government's breach of the implied covenant of good faith and fair dealing.

### D. Damages

When this Court finds a CO's decision to terminate the contract for default wrongful, the termination for default is converted into a termination for convenience. *See Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 637 (1997). A termination for convenience "allows the government to terminate a contract in whole or in part if the contracting officer 'determines that a termination is in the Government's interest.'" *See id.* (citing 48 C.F.R. § 52.249-2(a)). This Court has found that where "a contractor can successfully demonstrate that a CO's decision to terminate its contract for default was made in bad faith, the contractor will not be limited to damages in accordance with the termination for convenience clause." *See Keeter Trading*, 79 Fed. Cl. at 263 (citing *Torncello v. United States*, 231 Ct. Cl. 20 (1982)). As determined above, the actions of Ms. O'Connell and other postal officials show that the government acted in bad faith. Therefore, plaintiff is not limited to damages in accordance with the termination for convenience clause. Though plaintiff is not limited to termination for convenience damages, plaintiff may not be "placed in a better position through the award of [expectancy] damages than if there had been no breach." *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 212 (2007). Therefore, "[e]xpectation damages are recoverable provided they are 'actually foreseen or reasonably foreseeable.'" *Id.* at 213.

Mr. Bowles' contract provided for a completion date of March 31, 2013. *See* Pl.'s Ex. 2 at 5. Absent abuse on the part of postal officials, it is foreseeable that Mr. Bowles would have completed the contract on March 31, 2013. The accrued damages associated with the remaining fourteen months on Mr. Bowles' contract total $16,221.27. Furthermore, the Court finds it foreseeable that Mr. Bowles would have renewed his contract for one additional term. The Court bases this decision on testimony about the contract renewal process gathered at trial, which established a custom of automatic renewal absent negative reviews of the contractor. *See* Tr. 318:11–18; Tr. 340:9–11. The Court finds it foreseeable that Mr. Bowles would have completed his contract and been offered the renewal contract, as no negative reviews were filed against Mr. Bowles absent bad faith on the part of postal officials. It is also clear through Mr. Bowles' testimony that he considered the job the best one he ever had and would have continued it absent

the harassment.  *See* Tr. 153:2–11.  Thus, the amount owed for the remainder of plaintiff's original contract is $16,221.27.  The accrued damages of Mr. Bowles' renewal contract total $56,150.55, assuming his contract lasted the same amount of time as his previous contract.  Accordingly, the Court awards plaintiff $72,371.82.

**V.      Conclusion**

The Court finds that the Contracting Officer's termination of Mr. Bowles' contract for default was improper and in bad faith.  Therefore, the Court grants judgment for plaintiff.  For the reasons set forth above, the Court awards plaintiff $72,371.82.  Additionally, the Court dismisses defendant's Counterclaim for reprocurement costs.  The Clerk of Court is directed to enter judgment consistent with this Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge